# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAN KOWALSKI McDONALD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18 C 1277 |
| ) | |
| COOK COUNTY OFFICERS' ) | Judge John J. Tharp, Jr. |
| ELECTORAL BOARD, DAVID ORR ) | |
| in his official capacity as Cook County ) | |
| Clerk and Chairman, KIMBERLY ) | |
| FOXX, in her official capacity as Cook ) | |
| County State's Attorney and Member, ) | |
| and DOROTHY BROWN, in her official ) | |
| capacity as Clerk of the Circuit Court of ) | |
| Cook County and Member, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Candidates for the office of Cook County Clerk must submit nominating petitions signed by at least 8,236 qualified voters to appear on the ballot for the March 20, 2018 Democratic Party primary election. In this case, Plaintiff Jan Kowalski McDonald submitted a nominating petition that contained only 7,916 valid signatures. Nonetheless, she argues that, under *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), the state may require her to obtain, at most, 5,000 signatures to appear on the ballot—the number required of candidates for statewide office. Because the primary election is less than a week away,[1] she

---

[1] In fact, early voting has already begun. In suburban Cook County, ballot applications to vote by mail were available on December 20, 2017 and early voting sites opened on March 5. *See Ways to Vote*, Cook County Clerk's Office, https://www.cookcountyclerk.com/agency/ways-vote. In Chicago, early voting in conjunction with voter registration was available as early as February 21. *See Early Voting*, Chicago Board of Election Commissioners, https://chicagoelections.com/en/early-voting.html. Although the Court set the timing of the TRO hearing so that it could issue a ruling before the primary date, neither McDonald nor the defendants raised any issue concerning the effect of a TRO altering the ballot after voting has

seeks a temporary restraining order enjoining the Cook County Officers' Electoral Board (the "Board") and its members from enforcing any signature requirement greater than 5,000 for the Cook County Clerk race and to include her name on the upcoming Democratic Party primary ballot. The Court concludes that McDonald has not demonstrated a likelihood of success on the merits and therefore denies the motion.

## BACKGROUND

The Illinois Election Code provides that candidates for any Cook County office, including the Office of Cook County Clerk, must submit a petition for nomination containing "at least the number of signatures equal to 0.5% of the qualified electors of [their] party who cast votes at the last preceding election in Cook County." 10 ILCS 5/7-10(d)(1). For the upcoming primary election, the parties agree that this requirement means that McDonald, as well as other countywide candidates, had to obtain 8,236 qualified signatures. A separate provision of the Illinois Election Code establishes that candidates for statewide office are required to submit petitions containing a minimum of 5,000 qualified signatures. 10 ILCS 5/7-10(a).

McDonald alleges that she timely filed a nominating petition that contained 22,057 signatures. After an examination of McDonald's petition, the Cook County Clerk's office determined that she obtained 8,684 valid signatures (more than 400 above the requirement). However, an objection was raised regarding the propriety of McDonald's signature collection

---

already begun. Because the Court is denying the plaintiff's motion, it is not necessary to grapple with that issue, but it might be a significant one. Some as yet unknown number of voters have already cast their ballots having been told that McDonald and several other candidates whose names appear on the ballot are no longer eligible and that votes cast for them will not be counted; were McDonald to be restored to the ballot, it is no stretch to imagine that some early voters would claim that they were precluded from voting for the candidate of their choice. The Court takes no position on this issue presently, but it may warrant consideration by election authorities in setting deadlines for ballot access, ballot challenges, and early voting schedules.

process.[2] Following an evidentiary hearing, a hearing officer assigned to her case determined that McDonald had deliberately altered a number of addresses on her petition sheets. The Board met later that day to consider the hearing officer's findings and voted unanimously to remove McDonald from the ballot. Specifically, the Board adopted the hearing officer's recommendation to invalidate over 700 altered signatures, which caused McDonald to fall below the required signature threshold. McDonald filed a petition for judicial review challenging the Board's decision; however, a Cook County circuit court upheld the decision on March 12, 2018. The circuit court's decision is currently pending appeal.[3] The result of the litigation to date is that McDonald stands 320 signatures short of qualifying for the ballot as a Democratic candidate for Cook County Clerk, but exceeds the 5,000 signature requirement that would have qualified her for inclusion on the party's primary ballot had she run for a statewide office.

McDonald claims that her exclusion from the ballot pursuant to 10 ILCS 5/7-10 violates the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Voting Rights Act. She seeks a temporary restraining order enjoining defendants from enforcing any signature requirement greater than 5,000 for the office of Cook County Clerk and to include her

---

[2] The objection was filed by a private party, Reginald Lamont Featherstone, Sr. Illinois law permits any legal voter to file objections to nomination petitions with the state Board of Elections or local election officials where the nomination petition was filed. 10 ILCS 5/10-8. The Seventh Circuit has upheld this private objection process against constitutional challenge, agreeing that "§ 10-8 imposes no greater burden on candidates than the signature requirements we upheld in *Nader v. Keith*, 385 F.3d 729, 733 (7th Cir. 2004)." *Gould v. Schneider*, 448 F. App'x 615, 617-19 (7th Cir. 2011). In the same case, the court of appeals also agreed that "§ 10-8 does not violate the Voting Rights Act because it neither prevents anyone from voting nor keeps a potential candidate off the ballot because of race or color." *Id.*

[3] The history of the objection proceeding and McDonald's petition for judicial review is drawn from *McDonald v. Cook County Officers Electoral Board*, 2018 IL App (1st) 180406, ¶¶ 3-8, and the parties representations during the motion hearing held on March 13, 2018.

name on the March 20, 2018 Democratic ballot without qualification.[4] McDonald's motion has been fully briefed and argued at a hearing on March 13, 2018. For the reasons stated below, the motion is denied.

## DISCUSSION

At the outset, the Court must address two arguments raised by the defendants asserting that that the Court should not address the merits of McDonald's motion. They first argue in their response brief that the Court must abstain from adjudicating this suit under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). The *Younger* doctrine is an "exception to the general rule that federal courts must hear and decide cases within their jurisdiction" and "reflects a concern that federal interference with certain types of important state proceedings is unwise and unnecessary in a system of dual sovereigns." *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 815 (7th Cir. 2014). The doctrine applies in only three specific situations: where federal jurisdiction would intrude on (1) ongoing state criminal proceedings, (2) civil enforcement proceedings akin to criminal prosecutions, and (3) civil proceedings "that implicate a State's interest in enforcing the orders and judgements of its courts." *Id.* (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013)). Outside of these "exceptional" circumstances, "*Younger* abstention is not appropriate even when there is a risk of litigating the same dispute in parallel and redundant state and federal proceedings." *Id.* at 816 (citations omitted).

The defendants rely on the third class of proceedings and argue that McDonald's state lawsuit implicates an important state interest of determining who may appear on an election

---

[4] The defendants represented during a prior hearing that, because they have already been printed, McDonald's name will appear on the March 20, 2018 ballot regardless of the outcome of this motion. However, absent the entry of a temporary restraining order, notices will be (and have been; see *supra* note 1) provided with each ballot indicating that any vote cast for McDonald will not be counted. This procedure also applies to other candidates who were disqualified after the ballots had already been printed.

ballot. This argument is unavailing for two reasons. As an initial matter, McDonald's petition for judicial review of the Board's decision plays no role in the *Younger* analysis. The focus instead must be on the Board's review of McDonald's petition. *See id.* ("In our review of *Younger*, Mulholland's state suit plays no role. . . . We focus instead on the proceedings before the Board.") (citing *Sprint*, 134 S. Ct. at 591-92; *New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 369 (1989)). Which brings the Court to its second point: the Seventh Circuit has made clear that the "critical consideration" in determining whether *Younger* applies is how closely the state proceeding "resembles a criminal prosecution." *Mulholland*, 746 F.3d at 816. Without some likeness to a criminal tribunal, the doctrine would apply to "virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important interest." *Id.* (quoting *Sprint*, 134 S. Ct. at 593). Here, the defendants have not and cannot show that the Board's review of McDonald's petition implicates the state's interests in investigating, enforcing, and sanctioning violations of its laws. *See id.* at 817. The Board's review was initiated not by the state but by a private party who filed an objection to McDonald's petition, *see McDonald*, 2018 IL App (1st) 180406, ¶ 3, and the defendants do not argue that the proceeding presents the possibility of any criminal penalty. Thus, *Younger* does not apply. *See Nader v. Keith*, 385 F.3d 729, 731-32 (7th Cir. 2004) (branding similar *Younger* argument "frivolous").

The defendants next argue that this suit should be dismissed as *res judicata*. At the motion hearing, the defendants informed this Court that the circuit court determined on March 12, 2018 (the day before the motion hearing here), that McDonald was properly removed from the ballot. In raising this issue, the defendants contend that because McDonald could have raised in state court the constitutional arguments she asserts in this Court, the circuit court's recent decision bars her claims here. The court disagrees with the defendants on this point as well.

Under the doctrine of *res judicata* (more commonly known as claim preclusion), a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties on the same cause of action. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467, 889 N.E.2d 210, 213 (2008).[5] The doctrine "bars not only what was actually decided in the first action but also whatever could have been decided." *Id.* "Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been rendered by a court or competent jurisdiction; (2) an identity of cause of action exists, and (3) the parties of their privies are identical in both actions." *Id.*

McDonald argues that she could not have presented her constitutional claims in the state proceeding. That seems doubtful—*see, e.g.*, *Crowley v. Bd. of Educ. of City of Chi.*, 2014 IL App (1st) 130727, ¶ 35 ("Any issue that is not raised before the administrative agency, even constitutional issues that the agency lacks the authority to decide, will be forfeited by the party failing to raise the issue.") (citations omitted)—but the Court need not resolve that question to reject the application of *res judicata* because there is not yet a final judgment in the state proceeding. The Illinois Supreme Court has held that an Illinois judgment is not final, and thus not entitled to preclusive effect, until appellate review has been exhausted. *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113, 499 N.E.2d 1373, 1375 (1986) (requiring exhaustion of appellate review for purposes of collateral estoppel); *Relph v. Board of Educ.*, 84 Ill. 2d 436, 442-43, 420 N.E.2d 147, 149-50 (1981) ("Since the judgments in these cases were still subject to the appellate process, they were not to be given res judicata effect"). The circuit court's decision here was rendered only a few days ago and, according to McDonald, was appealed immediately

---

[5] Because "[a] state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court," *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 772 (7th Cir. 2013) (citation omitted), Illinois law governs the preclusive effect of the circuit court's judgment.

6

thereafter. Therefore, because McDonald has not exhausted the appellate process in the state court proceeding, she is not precluded from asserting her constitutional claims in this Court.

Having determined that this suit can move forward, the Court turns to the merits of the motion.[6] McDonald's principal argument is that the signature requirement for Cook County office seekers, found in 10 ILCS 5/7-10, is unconstitutional under the Supreme Court's holding in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). That case involved a challenge to the Illinois Election Code in the context of a special general election for the Mayor of Chicago. At the time, the statute required new political parties and independent candidates for statewide office to obtain 25,000 signatures to appear on the ballot. *Id.* at 175. New parties and independent candidates for office in political subdivisions of the state, by contrast, required signatures of at least 5% of the number of voters who voted in the previous election for offices within that political subdivision. *Id.* at 175-76. The mechanism produced the "incongruous result" that to gain access to the ballot, a new party or independent candidate in the City of Chicago or Cook County needed substantially more signatures—nearly 36,000 for the election at issue in the case—than a similarly-situated party or candidate for statewide office. *Id.* at 176-77. The Court found that although states have "a legitimate interest in regulating the number of candidates on the ballot," the discrepancy in signature requirements violated the Equal Protection Clause because the state had advanced "no reason, much less a compelling one" for

---

[6] To establish a right to the "extraordinary remedy" of preliminary injunctive relief, McDonald must show, among other requirements, that she is reasonably likely to succeed on the merits of her claims. *Whitaker ex. rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (noting that standard for issuing temporary restraining order is identical to standard for preliminary injunction). In view of the Court's determination that McDonald has failed to demonstrate that she has a reasonable likelihood of success on the merits of her claims, the Court need not consider whether she has satisfied the remaining requirements for preliminary injunctive relief.

imposing a higher burden on candidates for Chicago and Cook County offices than it did for candidates of state offices. *Id.* at 184-87.

McDonald contends that in light of *Socialist Workers Party*, a ballot access law is "facially" unconstitutional under the Equal Protection Clause when it has the possibility of yielding, as is the case here, a numerically greater signature requirement for candidates seeking a county or municipal office than for candidates seeking statewide office. There are two fundamental flaws in McDonald's argument. The first is that McDonald misconstrues the concept of a facial challenge. A facial challenge "asserts that a statute is invalid on its face ***as written*** and authoritatively construed, when measured against the applicable substantive constitutional doctrine, ***without reference*** to the facts or circumstances of particular applications." *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (citation omitted) (emphasis added). But that is not what McDonald is doing here. Rather, she asserts that Illinois' ballot access law is unconstitutional, as applied in the specific context of her case, because two "anomalies" that occurred during the last general election in 2016—the candidate for Recorder of Deeds was unopposed, thereby giving her an unusually large number of votes, and it was a Presidential election year—have driven the countywide signature requirement above the 5,000 signature level for the statewide candidates. As a result of the abnormally high signature requirement, McDonald continues, she (and other female and minority candidates in Cook County) have been prevented from gaining access to the Democratic primary ballot in the upcoming election.

The import of McDonald's as-applied challenge (as opposed to facial challenge) is that, to succeed under an equal protection theory, she must show that the Illinois Election Code was motivated by discriminatory intent or purpose. That is because when dealing with a facially-

8

neutral statute, as is the case here, the plaintiff must do more than present evidence of a disparate impact on women or minorities to establish an equal protection violation. *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("a purpose to discriminate must be present"); *see e.g.*, *Harlan v. Scholz*, 866 F.3d 754, 761 (7th Cir. 2017) (vacating preliminary injunction barring election-day registration and voting, in part, because the equal protection claim failed where plaintiff "offer[ed] no evidence of discriminatory intent, as opposed to evidence of some differences in treatment"); *Alston v. Madison*, 853 F.3d 901, 907 (7th Cir. 2017) ("But even if [plaintiff] can show a discriminatory effect, his equal-protection claim fails because he cannot show a discriminatory purpose."); *Bond v. Atkinson*, 728 F.3d 690, 692-93 (7th Cir. 2013) (discussing how disparate impact alone does not violate equal protection in context of claim that state elected to provide greater protective services for men than women). But all McDonald has put forward here is evidence of disparate impact—specifically, that several female and/or minority challengers (as opposed to party-back candidates) for countywide office were unable to obtain enough valid signatures to get on the ballot, while three white male challengers succeeded. McDonald's contention ignores that there are several candidates presently on the ballot who are female, a minority, or both, including Toni Preckwinkle, Karen Yarbrough, Maria Pappas, and Joseph Berrios. In view of the fact that most of the candidates on the ballot for the major county offices are, in fact, minorities and/or women, McDonald fails to show even discriminatory effect on the basis of race or gender, much less discriminatory intent.

Moreover, the seeming incongruity of requiring more signatures for county office than for statewide office is, as McDonald herself points out, the product of anomalies that in combination produced a signature requirement in excess of the flat figure required for state offices. According to McDonald, in typical years, the signature requirement for county offices is

9

*lower* than for state offices. In ascribing the higher signature requirement for this election as anomalous—that is, a result that deviates from the expected norm—McDonald effectively concedes that the signature requirement is ***not*** the product of an intentional scheme to disadvantage any particular class of voter or candidate. This conclusion is further buttressed by the fact that Cook County's signature requirement is no different than that of any other county in the state (the same formula is used to compute the signature requirement for other counties as well, *see* 10 ILCS 5/7-10(c)-(d)), and McDonald has not presented any evidence as to whether the anomaly she has experienced with respect to the Cook County signature requirement has occurred in any other counties. McDonald, in short, has failed to provide any basis to infer that the higher signature requirement that prevails in Cook County for the 2018 primary election is the product of an intention to disenfranchise women and minorities.

The other flaw in McDonald's equal protection argument is that the Seventh Circuit does not read *Socialist Workers Party* as broadly as she does. *See, e.g.*, *Bowe v. Bd. of Election Comm'rs of City of Chi.*, 614 F.2d 1147 (1980); *Gjestern v. Bd. of Election Comm'rs for City of Chi.*, 791 F.2d 472 (7th Cir. 1986); *Stone v. Bd. of Election Comm'rs for City of Chi.*, 750 F.3d 678 (7th Cir. 2014). Indeed, in *Bowe*, the court expressly rejected the argument, reiterated by McDonald in this case, that *Socialist Workers Party* "stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." 614 F.2d at 1151. It found instead that courts must take an "intensely practical and fact-oriented approach to deciding" ballot access issues, as the Supreme Court had done in prior election cases. *Id.* at 1152. Viewing *Socialist Workers Party* in this light, the appellate court dissolved an injunction barring the application of provisions in the Illinois Election Code imposing a 10% minimum signature requirement on

candidates for the office of Ward Committee in Chicago—which, depending on the ward, meant between 834 and 2,280 signatures—while candidates for State Central Committeeman required a fixed minimum of only 100 signatures to qualify for the ballot. *Id.* at 1150, 1153. The Court found that the injunction was not warranted absent a more fully-developed factual record "as to the circumstances, background and operation of the statue in question." *Id.* at 1152-53.

Since *Bowe*, the Seventh Circuit has continued to eschew the broad reading that McDonald champions. In *Gjersten*, the court echoed that *Socialist Workers Party* does not stand for the "broad proposition that a state may never impose a higher signature requirement of an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." 791 F.2d at 477 (quoting *Bowe*, 614 F.2d at 1151). And more recently, in *Stone*, the court reiterated that "the absolute or relative number of signatures required" is not the "[w]hat is ultimately important" in ballot access cases. 750 F.3d at 682. As Judge Bucklo recently observed in a virtually identical suit brought by other candidates challenging the higher signature requirement for county offices in the upcoming 2018 primary, "[i]n the face of these [and other] decisions, plaintiffs must come forward with something more than dogged reliance on an expansive reading of *Socialist Workers Party* to show that the signature requirement the Illinois Election Code imposes on them amounts to an unreasonable burden on their fundamental rights." *Acevado v. Cook Cnty. Officers Electoral Bd.*, No. 18 C 293, 2018 WL 572509, at *4 (N.D. Ill. Jan. 24, 2018).

Rather than applying a statistical litmus-paper test that McDonald urges under the Equal Protection Clause, the more appropriate lens with which to analyze the signature requirement is the approach set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See, e.g.*, *Harlan*, 866 F. 3d at 759 (the *Anderson-Burdick* test is used to

11

"address[] the constitutional rules that apply to state election regulations"); *Navarro v. Neal*, 716 F.3d 425, 439 (7th Cir. 2013) (stating that "[t]o assess the constitutionality of ballot access laws, we engage in a two-step inquiry" established under *Anderson-Burdick*). Under that line of cases, courts must determine to what extent fundamental individual rights under the First Amendment are burdened by a state's election laws, and then determine if the interests put forward by the state as justification for that burden are sufficient.[7] *Anderson*, 460 U.S. at 789. Although this is a two-step process, "much of the action takes place at the first stage." *Stone*, 750 F.3d at 681. That is because "[i]f the burden on the plaintiffs' constitutional rights is 'severe,' a state's regulation must be narrowly drawn to advance a compelling state interest." *Id.* at 681 (quoting *Burdick*, 504 U.S. at 434). Conversely, if the burden is "'reasonable' and 'nondiscriminatory,'" then "the government's legitimate regulatory interests will generally carry the day." *Id.* (again quoting *Burdick*). Moreover, in determining whether a ballot access law places a severe burden on candidates, the ultimate question is whether a "reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Id.* (citing *Bowe*, 614 F.2d at 1152).

To be sure, McDonald contends that a reasonably diligent candidate could not be expected to meet the 8,236 signature requirement within the 90-day circulation period provided under state law. What she lacks, though, is evidence. She relies almost exclusively on her own assessment of voters' attitudes and dispositions, which reflect nothing more than crude stereotypes. For example, she states that she had difficultly circulating her petition among

---

[7] The *Anderson-Burdick* methodology reflects a shift in the analysis of ballot access issues away from the Equal Protection Clause to the First Amendment. *See Norman v. Reed*, 502 U.S. 279, 289 n.8 (1992) ("As in [*Anderson*], we base our conclusion directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment.") (internal quotation marks omitted).

Hispanic communities because voters in those communities were fearful that signing a petition could lead to the retention of information for deportation purposes. The Court will not indulge the implicit premise of this argument—that all, or mostly all, of the population in Hispanic communities are unlawful immigrants, and McDonald provides absolutely no basis to assess how widespread the fear she describes may be or what concrete effect it had on her ability to obtain signatures. Her gross overgeneralizations are not limited to minority communities; elsewhere she states that she was unable to obtain many signatures in Winnetka because most voters in that area are Republican, without providing any data to support that claim (*contra, see Harlan*, 866 F.3d at 760: "there is no necessary correlation between affluence, county size, and a tendency to vote Democratic") and without explaining why, if a Republican stronghold is not fertile ground for a Democrat to obtain nomination petition signatures, she invested resources in canvassing that area. McDonald's motion similarly calumnizes women voters as so timid that they are unwilling to engage a petition circulator for "fear of stalking"; men, apparently, are immune from concerns about personal safety. "Older voters," she says, are so concerned with identity theft that they are unwilling to provide even their name and address. These unsubstantiated and trite generalizations are not evidence and McDonald's declaration does not make them so; she is not in a position to testify about why large swaths of Cook County voters did not sign her petition or would be reluctant to sign her or anyone else's petition in this particular election.

What McDonald may credibly testify about, based on personal knowledge, are her own specific efforts to obtain signatures. And what is relevant about McDonald's efforts is how many signatures she obtained and how close she was to being placed on the ballot. McDonald's initial petition contained over 22,000 signatures—close to three times the amount she needed. Moreover, her petition survived an initial examination by the Cook County Clerk's Office; she

had 8,684 valid signatures after that review. It was only after the Board found that some of the addresses of the voters who signed her petitions had been altered after the fact that McDonald was removed from the ballot. Thus, the record indicates that but for the alteration issue, McDonald would have obtained the necessary number of signatures. In any event, even after altered signatures are excluded, she was very close to making the cut; she needed only 320 additional signatures. That, in it of itself, cuts against McDonald's argument that no reasonably diligent candidate could meet the requirement.

The Court notes as well, and McDonald acknowledges, that at least eight candidates running for the offices of Cook County Clerk, President, Sheriff, Treasurer, and Assessor, were able to garner 8,236 valid signatures during the 90-day period. *See Stone*, 750 F.3d at 683 ("[T]he fact that "nine candidates satisfied 65 ILCS 20/21-28(b) is powerful evidence that the burden of gathering 12,500 signatures in ninety days is not severe."). McDonald's response is that each of those candidates were either backed by the Cook County Democratic Party—and thus, were able to collect signatures more easily through the party apparatus and by using a slate—or were wealthy candidates who could afford to pay enough circulators to meet the requirement. But here again, McDonald lacks evidentiary support; there is simply no evidence in the record regarding the resources available to her or any of the other candidates running for Cook County office in this election, whether backed by the Democratic Party or otherwise. McDonald must do more than speculate about the ease in which other candidates were able to obtain signatures to show that the requirement at issue amounts to a greater burden on her and other candidates' constitutional rights. It is not self-evident, for example, why, as a "grass roots" candidate, McDonald could not herself run on a slate and thereby spread the burden of obtaining signatures among others; 10 ILCS § 5/7-10 expressly permits petitions to "contain the names of

14

2 or more candidates of the same political party for the same or different offices." If McDonald was unable to find even one other candidate to associate with on her nominating petition, that difficulty is not created by the statute, but by McDonald's own limitations as a candidate.

Finally, as the defendants point out, numerous cases have upheld minimum signature requirements substantially more robust than the 0.5% requirement that applies to McDonald. *See, e.g.*, *Burdick*, 504 U.S. 435 & n.3 (suggesting that requirement to obtain signatures from 1% of state's voters was within constitutional limits); *Norman v. Reed*, 502 U.S. 279, 282 n.2, 295 (1992) (upholding Illinois election provision requiring suburban district commissioner candidates to obtain lesser of 5% of vote or 25,000 signatures); *Jenness v. Fortson*, 403 U.S. 431, 438 (1971) (finding that requirement for independent candidate to obtain signatures from 5% of eligible voters was constitutional); *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 775-76 (7th Cir. 1997) (upholding Illinois election law requiring new political parties to satisfy 5% petition requirement to run candidates in congressional races); *see also Stone*, 750 F.3d at 683 (observing that percentages ranging from 1% to 5% of eligible voting base have been found to be constitutional). While these cases do not establish a bright-line rule for constitutionality, they nonetheless "reflect the range of restrictions courts have considered to be reasonable." *Acevado*, 2018 WL 572509, at * 4. And particularly close to home, the Seventh Circuit has held that reasonably diligent mayoral candidates could gather 12,500 signatures in Chicago over a 90-day period. *Stone*, 750 F.3d at 684-85. If that requirement is not unduly burdensome—and the Seventh Circuit held that it was not—then it is difficult to see how the need to collect 34% fewer signatures during the same time period across Cook County (as opposed to just the City of Chicago) is constitutionally infirm. Thus, the Court finds at this juncture that the state's ballot

access rules for Cook County candidates in this election likely impose only reasonable, nondiscriminatory restrictions on candidates' constitutional rights.

From this point, the Court must conclude that McDonald likely cannot establish a constitutional violation. There is little question that the 8,236 signature requirement "serve[s] the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." *Id.* at 685 (citing *Navarro*, 716 F.3d at 429; *Anderson*, 460 U.S. at 788 n.9). Although McDonald contends there is little danger of voter confusion or ballot congestion in this case—indeed, Karen Yarbrough will run unopposed for Cook County Clerk if McDonald is not on the ballot—the state need not make a "particularized showing" to establish these interests. *Id.* at 685 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189,194-95 (1986)). Even a "speculative concern that altering the challenged signature requirement would lead to large number of frivolous candidates . . . and, consequently, voter confusion is sufficient." *Id.* (quoting *Navarro*, 716 F.3d at 432). The Court therefore finds that the State's interests are sufficient, based on the record available to the Court, to justify the 8,236 signature requirement for Cook County Democratic Party candidates.

Finally, McDonald's invocation of the Voting Rights Act does nothing to save her claim. Apart from the fact that her argument is essentially undeveloped and can be disregarded on that basis alone,[8] it falls short in any event given McDonald's failure to show that the signature

---

[8] "Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 848 (7th Cir. 2017) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)) (alterations omitted). Although McDonald devotes two and half pages of her brief to the Voting Rights Act, she fails to identify a single Voting Rights Act case that supports her contention that a facially neutral ballot access regulation violates the Act. Instead, most of her "argument" consists of a recitation of factors developed in the context of racial gerrymandering cases. *See Frank v. Walker*, 768 F.3d 744, 752 (7th Cir. 2014). And rather than offering real evidence of the effect of § 7-10(d) on people of race and color, McDonald blithely contends that the history of official

16

requirements of § 10-7(d) impose any burden on the basis of race or color. In the context of a challenge to ballot eligibility regulations, to state a cause of action under the Voting Rights Act McDonald must show that the regulation in question prevents ballot access because of race or color. *Gould*, 448 F. App'x at 617 (affirming dismissal of Voting Rights Act claim challenging law that allows individuals to object to validity of nominating petitions under § 10-8). To establish a violation of the Voting Rights Act, it must be "shown that the political processes leading to nomination or election in the State or political subdivision are *not equally open* to participation by a class of citizens . . . in that its members have *less opportunity* than other members of the electorate to participate in the political process." *Frank*, 768 F.3d at 753. Section 7-10(d) does nothing to foreclose the opportunity to participate in the nominating process, or to run for office, on the basis of race or color. If, as McDonald asserts, "minority voters will have more difficulty overcoming the barriers to effective candidate endorsement," that does not mean that minority voters have, by virtue of the ballot signature requirement, less opportunity to participate in the voting process, but only that they are less likely to *use* that opportunity." *Id.* at 753. By McDonald's reasoning, ***any*** voting requirement would likely be invalid under the Act to the extent one could claim that other barriers, having nothing to do with the voting regulation, magnify the burden on voters of minority race or color. As the Seventh Circuit stated in *Frank*, the Voting Rights Act "forbids discrimination by 'race or color' but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters." *Id*. The Act is better understood "as an equal-treatment requirement . . . than as an equal-outcome command." *Id*. at 754.

---

discrimination in Illinois, racial polarization in voting patterns, and the socioeconomic disparities affecting Illinois minority voters is "well documented" and thus, she is likely to succeed on the merits. Given, as McDonald concedes, that Voting Rights Act claims "can be fact intensive," the Court needs more than bare generalizations to grant the temporary restraining order she seeks.

* * *

Because McDonald is unable to demonstrate a reasonable likelihood of success on the merits of her claims—that is, she is not reasonably likely to establish either that Cook County's signature requirement for nominating petitions is unconstitutional or violates the Voting Rights Act—she is not entitled to a temporary restraining order. Accordingly, the Court denies McDonald's motion for temporary restraining order.

Date: March 15, 2018

John J. Tharp, Jr.
United States District Judge